# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ELLIOTT-LEWIS CORPORATION,

               Plaintiff

   v.

INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS, LOCAL
98, et al.,

              Defendants

CIVIL ACTION

No. 07-4446

Pollak, J.                                September 30, 2008

## OPINION

This is an action to vacate an arbitration award brought by plaintiff Elliott-Lewis Corp. against two defendants: the International Brotherhood of Electrical Workers, Local 98 ("Local 98"), and the Philadelphia Division of the Penn-Del-Jersey Chapter, National Electrical Contractors Association ("NECA"). Plaintiff has brought suit pursuant to 29 U.S.C. § 185 (Labor Management Relations Act) and 9 U.S.C. § 10 (Administrative Dispute Resolution Act). Because plaintiff's action arises under these federal statutes, this court has jurisdiction pursuant to 28 U.S.C.A. § 1331.

Before the court are motions for summary judgment filed by all three parties. For the reasons given below, the court will grant summary judgment for the defendants.

## I.

The parties agree that the material facts are not in dispute. Plaintiff Elliott-Lewis

Corp. is a Pennsylvania corporation that is the exclusive supplier of "show labor" — the labor for setting up and breaking down shows and exhibits — for the Pennsylvania Convention Center.  Defendant Local 98 is the collective bargaining representative for some of plaintiff's employees who work at the Convention Center.  Defendant NECA is a bargaining association of employers; NECA negotiates collective bargaining agreements ("CBAs") with Local 98 on behalf of NECA's member employers.  Plaintiff is not a member of NECA.  The Local 98/Elliott-Lewis CBA designates NECA as the arbitrator of any disputes.

The Convention Center is owned and operated by a Pennsylvania public authority, the Pennsylvania Convention Center Authority ("PCCA").  In 2003, the PCCA, plaintiff, and six unions that work in the Convention Center (among them defendant Local 98) entered an agreement called the Pennsylvania Convention Center Authority Customer Satisfaction Agreement ("CSA").  The CSA states that its purpose is "to change the manner in which work is performed at the Convention Center in order to ensure customer satisfaction."  CSA 3.  The parties to the CSA "agree that their respective collective bargaining agreements now in existence, insofar as such agreements apply to work performed at the Convention Center, are hereby amended by this Agreement and that this Agreement shall supersede any and all provisions of such collective bargaining agreements to the extent inconsistent herewith."  CSA 9.

Among other terms, the CSA regulates the permitted uses of non-union-labor by

exhibitors at the Convention Center; bars the unions from engaging in or threatening any kind of work stoppage, notwithstanding the rights arising out of any existing CBA;[1] and provides for "work first — grieve later" procedures for resolving disputes.  CSA 4, 6-8. The CSA requires that all disputes involving show labor "from whatever source they arise" be reported to a PCCA representative for resolution, and that "the PCCA . . . shall have the authority to render an immediate resolution of all such disputes."  CSA 7. Following resolution of the dispute by the PCCA representative, "an aggrieved party to a collective bargaining agreement shall be entitled to appeal the resolution pursuant to the dispute resolution procedures contained in such party's collective bargaining agreement . . . ."[2]  CSA 7.

Attached as exhibit C to the CSA is PCCA's Code of Conduct.  The CSA states that "[t]he parties agree that the PCCA has the obligation and right to adopt, administer and enforce its Code of Conduct with respect to all persons on its premises . . . ."  CSA 9. The Code of Conduct provides that "violation of any of the rules contained in this Code of Conduct, as determined by the Pennsylvania Convention Center Authority after an appropriate investigation, may result in the violators being barred from working at the facility."  Code of Conduct 1.

---

[1] The CSA does not limit the unions' ability to strike upon the expiration of a CBA, if the disputed provision of the CBA is not modified by the CSA.  CSA 7.

[2] A different appeals process, CSA 7-8, governs jurisdictional disputes; that different appellate process is not relevant to the problem at hand, which is not a jurisdictional dispute.  *See* footnote 6, *infra.*

On September 11, 2007, the PCCA determined that an act of vandalism had occurred at the Convention Center: electrical cords were severed and a contractor's light fixture was damaged.  A letter from PCCA to Local 98 dated September 14, 2007 stated that PCCA was "unsuccessful in [its] request for cooperation of the Trade Union in identifying the person and/or persons who committed this juvenile act" and had "no other resource to identify the persons who committed the vandalism."  Pl. Mot. S.J. Exh. 3 (Doc. No. 14, filed February 11, 2008).  However, the PCCA asserted that it was able to identify two Local 98 employees who were present in the ballroom when the vandalism occurred: Richard DiMucci and David Queroli.  *Id*.  The letter stated that these employees "are suspended for one month" beginning September 17, 2007.  *Id*.

Local 98 sent a letter to the PCCA stating that it was grieving the suspensions and requesting the PCCA to contact the union to schedule a grievance meeting.  Pl. Mot. S.J. Exh. 4.  Local 98 also sent a letter to NECA stating the union's position that DiMucci and Queroli had not committed the alleged acts of vandalism and requesting a hearing.  Pl. Mot. S.J. Exh. 5.  The PCCA took the position that it "is not party to any agreement requiring or permitting it to submit any dispute with the Union or its members to any NECA dispute resolution processes or procedures" and, accordingly, "NECA does not have the authority to conduct proceedings in this matter," and the PCCA "declines to participate in any NECA proceedings."  Pl. Mot. S.J. Exh. 6.  Elliott-Lewis also took the position that NECA did not have jurisdiction over "a grievance challenging the PCCA's

decision"; however, "without waiver of this objection," plaintiff agreed to attend the

NECA grievance hearing.  Pl. Mot. S.J. Exh. 7.

Before the tribunal, on October 12, 2007, Elliott-Lewis's representative[3] "stated

that he felt there was not just cause for the suspensions and requested that the Authority

[PCCA] rescind the suspensions and conduct a full investigation before further action was

taken," but that the Authority had "refused to do so."  Pl. Mot. S.J. Exh. 1 ("Grievance

Decision").  He also stated that Elliott-Lewis suspended Mssrs. DiMucci and Queroli

"only because it was instructed to do so by the PCCA."  Affidavit of Jeffrey P. Scarpello

¶ 4.

On October 17, 2007, NECA issued a "Grievance Decision" that determined that

there was no proper cause for the suspension of DiMucci and Queroli and, therefore,

ordered that DiMucci and Queroli be reinstated by plaintiff, and that each be paid back-

pay wages and benefits of one hundred sixty (160) hours at their regular rate and one

hundred sixty-two and a half hours (162.5) of overtime.  Pl. Mot. S.J. Exh. 1.

Following the award by the NECA tribunal, plaintiff filed the instant lawsuit.

Plaintiff has brought suit pursuant to 29 U.S.C. § 185 (Labor Management Relations Act)

and 9 U.S.C. § 10 (Administrative Dispute Resolution Act), contending that (1) the

dispute was not arbitrable, and, (2) if arbitration was proper, NECA's arbitration award

---

[3]In the grievance decision, Pl. Mot. S.J. Exh. 1, Elliott-Lewis's representative is
referred to as Jim Gentile.  In the affidavits of Jeffrey P. Scarpello and Lawrence
Delspechio, Elliott-Lewis' representative is referred to as David Gentile.

did not draw its essence from the arbitration clause.

## II.

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see IFC Interconsult, AG v. Safeguard Int'l Partners, L.L.C.*, 438 F.3d 298, 317 (3d Cir. 2006). A genuine issue of material fact exists where the jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over facts is material where it could affect the outcome of the case. *Belitskus v. Pizzingrilli*, 343 F.3d 632, 639 (3d Cir. 2003).

A party seeking summary judgment carries the initial burden of informing the district court of the basis for its motion and identifying the portions of the record that show that there is no genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986); *Belitskus*, 343 F.3d at 639. Where the non-moving party bears the burden of proof, the moving party must show that the non-moving party cannot support its case with the evidence in the record. *Celotex*, 477 U.S. at 325. In rebuttal, the non-moving party must then identify facts that create a genuine issue of dispute for trial. Fed. R. Civ. P. 56(e); *Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107, 112 (3d Cir. 1996). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

**III.**

*A.*

The initial, and central, question facing this court is whether the dispute between Elliott-Lewis and Local 98 was arbitrable.  As a general matter, "[o]ur national labor policy evinces a strong preference for peaceful, self-resolution of labor-management disputes."  *Bell-Atlantic-Penn. v. Comm. Workers, Local 13000*, 164 F.3d 197, 200-01 (3d Cir. 1999) (citations omitted).  The United States Arbitration Act of 1925, 9 U.S.C. § 1 et. seq., "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."  *Moses H. Cone Memorial Hospital v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983) (citations omitted).

From this posture in favor of arbitrability, we look to well-established guiding principles when determining whether a dispute is arbitrable:

> First, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Second, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." Third, "where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that, 'an order to arbitrate

the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'"

*Lukens Steel Co. v. United Steelworkers*, 989 F.2d 668, 672-73 (3d Cir. 1993) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)) (internal citations omitted)).

The Third Circuit focuses its analysis of arbitrability on three central questions: "'(1) Does the present dispute come within the scope of the arbitration clause[;] (2) does any other provision of the contract expressly exclude this kind of dispute from arbitration[;] and (3) is there any other 'forceful evidence' indicating that the parties intended such an exclusion.'" *United Steelworkers v. Rohm and Haas Co.*, 522 F.3d 324, 331 (3d Cir. 2008) (quoting *E.M. Diagnostic Sys. Inc. v. Local 169, Int'l Bhd. Of Teamsters*, 812 F.2d 91, 95 (3d Cir. 1987)).

First, we consider whether the scope of the arbitration clause is such that the presumption of arbitrability applies. The "presumption of arbitrability" arises when an arbitration clause is "clearly broad or ambiguous." *Local 827, IBEW v. Verizon New Jersey, Inc.,* 458 F.3d 305, 311 (3d Cir. 2006). However, "[w]here the arbitration provision is narrowly crafted, 'we cannot presume, as we might if it were drafted broadly, that the parties here agreed to submit all disputes to arbitration . . ..'" *Id.* at 310 (quoting *Trap Rock Indus. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 888 n. 5 (3d Cir.1992)).

The arbitration clause in the CSA seems to sweep broadly and therefore renders grievances brought pursuant to it presumptively arbitrable.  The clause is contained in Part K of the CSA.[4]  Part K's introductory paragraph states that "disagreements or

---

[4]Part K, entitled "Dispute Resolution Procedures," reads in pertinent part:

The parties recognize that, despite their best efforts to establish rules for the orderly conduct of work at the Convention Center, there exists the possibility that disagreements or disputes will occur.  The parties, therefore, have agreed to utilize the following dispute resolution procedures – based on the principle of "work first - grieve later" – to ensure the fair and efficient adjudication of such disputes without work interruptions:

1.  Reporting Disputes.  All disputes involving Show Labor and/or Show Labor Workers which necessitate resolution, from whatever source they arise, shall be reported immediately to the designated PCCA representative who shall facilitate the prompt resolution of the dispute as outlined herein.  Under no circumstances shall any dispute be brought to the attention of the customers, exhibitors, or attendees, as described in the Code of Conduct.

2.  Resolution of Disputes Impacting Ongoing Work.  To ensure the resolution of any such dispute with NO DISRUPTION OF WORK, the parties acknowledge and agree that the PCCA, through its designated representative, shall have the authority to render an immediate resolution of all such disputes of any nature in the course of the planning for and execution of a convention, trade show or other event, including without limitation jurisdictional disputes.

The parties agree that, in the event of any violation of this Agreement, the offending person or persons may be ejected from the Convention Center premises and barred from returning by the Labor Supplier.  Any dispute involving the circumstances of such ejection may be appealed in accordance with the Appeals procedure below.

3.  Appeal to Binding Arbitration.  Once resolved as set forth above, an aggrieved party to a collective bargaining agreement shall be entitled to appeal the resolution pursuant to the dispute resolution procedures contained in such party's collective bargaining agreement, except for jurisdictional disputes which shall be resolved in accordance with the Expedited Jurisdictional

-9-

disputes" will be resolved using "the following dispute resolution procedures." CSA 7. By not specifying which disputes are covered, the agreement implies that all are. Section 1 of Part K outlines procedures for reporting "*[a]ll* disputes involving Show Labor and/or Show Labor Workers," while Section 2 vests power in PCCA to resolve "*all* such disputes of *any nature*" involving ongoing work. *Id.* (emphasis added). Section 2's second paragraph goes on to vest a concurrent power in the Labor Supplier (Elliott-Lewis) to eject and bar from the Convention Center offending parties "in the event of any violation of this Agreement." *Id.*

Section 3 of Part K of the CSA, which follows directly after Section 2, provides that "an aggrieved party to a collective bargaining agreement" is entitled to arbitration, as provided in the CBA, for disputes "resolved as set forth above." *Id.*[5] Importantly, Section 3 does except jurisdictional disputes from appeals to arbitration under the CBA. Instead of using the CBA's arbitration procedure, jurisdictional disputes are resolved according to Section 4.[6] CSA 7-8.

The plain meaning of Section 3 — the arbitration clause at issue here — is that the

---

Dispute Resolution Procedures set forth below.

[5] The CBA has its own detailed set of arbitration procedures. There is no disagreement between the parties that, apart from the issue of whether the arbitrator should have arbitrated the dispute at all, those procedures were properly followed.

[6] Section 4 of the CSA goes on to outline detailed procedures for arbitration in the event of a jurisdictional dispute. Otherwise, the CBA referenced in Section 3 provides the arbitration procedures for all appeals, including the one at issue in this matter.

arbitration procedure applies to appeals of all disputes resolved according to the previous sections of Part K.  Those sections of Part K grant extremely broad authority to both PCCA and the Labor Supplier (Elliott-Lewis).  At first blush, therefore, the arbitration clause appears broad in scope.

Plaintiff contends that "a close reading of the language of" the arbitration clause at issue here is narrow because "[t]here is no provision for arbitration regarding Convention Center ejections dictated by PCCA."  Pl. Mot. S.J. 14.  However, proving that an arbitration clause is narrow requires demonstrating that certain disputes are expressly excluded, *not* that they are *not* expressly included.  This court is therefore "unpersuaded that" Elliott-Lewis "has met its burden of establishing with 'positive assurance' that" Section 3 "is not susceptible of an interpretation covering this dispute."  *See Local 770 v. Geldin Meat Co.*, 13 F.3d 1365, 1368 (9th Cir. 1994) (rejecting a "plain language" argument somewhat similar to Elliott-Lewis's).

In order to overcome the presumption of arbitrability by proving that an arbitration clause is narrow enough to exclude the grievance at issue in this litigation, Elliott-Lewis "must show (1) that the Agreement[] expressly exclude[s] the dispute[] from arbitration or (2) the existence of 'strong and forceful' evidence of an intention to exclude [it] from arbitration."  *Lukens*, 969 F.2d at 1475.[7]

---

[7]These two methods of overcoming the presumption of arbitrability mirror, not coincidentally, the two questions our Circuit has ordered courts to address after considering the scope of the arbitration clause at issue.

"Cases holding that the arbitration clauses at issue are narrow have generally relied on language expressly limiting the scope of the clause to specific subject matter." *United Steelworkers*, 522 F.3d at 331; *see, e.g., Verizon*, 458 F.3d at 311 (finding a clause was narrow and not applying the presumption where the CBA listed "five specific issues that can be arbitrated" and thus "clearly foreclose[d] the possibility that other issues could be arbitrated by providing that the list is exclusive"); *Trap Rock,* 982 F.2d at 889 (characterizing as narrow an arbitration procedure that "expressly provid[ed] that there shall be no arbitration of discharges or demotions arising from deficiencies in qualifications or performance").

In *Verizon*, the court emphasized that the narrow arbitration clause did "not refer expansively to 'any' disputes, but rather to disputes about issues that are specifically enumerated." 458 F.3d at 311. In contrast, Section 2 of Part K of the CSA, entitled "Resolution of Disputes Impacting Ongoing Work," provides procedures for the resolution of "all such disputes of any nature in the course of the planning for and execution of a convention, trade show or other event." CSA 7. The CSA's arbitration clause – Section 3 of Part K – applies to disputes "resolved as set forth above." *Id*. In this case, the court is asked to determine the arbitrability of a dispute involving show laborers DiMucci and Queroli, who were working "during the set up" of an "event." Pl. Mot. S.J. ¶ 19. The arbitration clause is therefore more than broad enough to presumptively cover this dispute.

Unlike the arbitration procedures held "narrow" in *Verizon* and *Trap Rock*, the CSA's dispute resolution procedures do not expressly limit the subject matter of disagreements covered. The only express limiting language refers to jurisdictional disputes, which are governed by the detailed procedures set forth in Section 4. Otherwise, the plain language of Section 3 provides for arbitration, according to the terms of the CBA, for virtually any type of dispute.  The propriety of the PCCA's suspension of DiMucci and Queroli is thus presumptively arbitrable because the arbitration clause contains no "language expressly limiting the scope of the clause to specific subject matter." *See United Steelworkers*, 522 F.3d at 331.  Rather, Section 3's language only excludes jurisdictional disputes, leaving virtually limitless the subject matter of substantive grievances (including the underlying grievance here) that qualify for the CBA's arbitration procedures.

Section 3 does impliedly limit *who* can invoke arbitration, but it does not limit *what* a proper party may challenge.  It permits appeals by "an aggrieved party to a collective bargaining agreement . . . pursuant to the dispute resolution procedures contained in such party's collective bargaining agreement."  CSA 7.  Because PCCA is not a signatory to the collective bargaining agreement between Elliott-Lewis and Local 98, PCCA can neither challenge nor be challenged pursuant to the collective bargaining agreement.  But PCCA's inability to gain access to, or to be reached by, the CBA's appellate process does not imply that proper parties under the CBA cannot challenge, and

-13-

defend, PCCA's decisions amongst themselves.

The arbitration clause in Part K Section 3 applies to all disputes "resolved as set forth above" in Part K Sections 1 and 2.  It does not explicitly limit an aggrieved party's right to appeal a decision made by PCCA.  This Circuit's guiding principles direct that "an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Lukens*, 989 F.2d at 673 (citations omitted).  Because Section 3's delimitation of parties contains no express language proscribing what a proper party may challenge, it is susceptible to an interpretation that the signatories to the CBA agreed to arbitrate the appeals of any decisions — including those made by PCCA — that affect their relationships with other parties to the CBA.

Nor is there "forceful evidence," *United Steelworkers*, 522 F.3d at 331, that the parties intended to exclude the dispute at issue from arbitration.  To the contrary, the parties' decision to apply different dispute resolution procedures to substantive and jurisdictional disputes is strong and forceful evidence that the parties knew how to exclude specific matters from arbitration and would have done so had that been their intent.  *See Eichleay Corp. v. Int'l Ass'n of Bridge*, 944 F.2d 1047, 1058 (3d Cir. 1991) (holding that an arbitration clause that "expressly excludes grievances pertaining to jurisdictional disputes . . . indicates that the parties knew how to remove issues from arbitration when they wanted to" ).  By carving out distinct dispute resolution procedures

-14-

for jurisdictional disputes under Section 4 of Part K, the CSA reveals an intent to subject all other disputes to the CBA as directed in Section 3.  Had the parties wished to entirely bar arbitration appeals regarding decisions made by PCCA, they easily could have done so explicitly in the CSA.

Plaintiff contends that a full reading of the CSA, together with the Convention Center Code of Conduct that the CSA incorporates, is forceful evidence that plaintiff never intended to subject itself to arbitration appeals of decisions rendered by PCCA. Part P of the Code of Conduct gives PCCA the right to "eject[] and/or prohibit[] from working on the premises" any person found to have violated the Code."  Code of Conduct 4.  Part R of the Code grants PCCA the authority "to impose appropriate remedial action for any inappropriate conduct not specifically covered" in the Code, as well as the power "to alter or modify this Code of Conduct at any time."  Code of Conduct 5.  Moreover, and as discussed *supra*, PCCA is not subject to the CBA and therefore cannot itself be subject to appellate proceedings concerning its decisions.  Plaintiff is therefore largely (though not necessarily entirely) correct that "PCCA has the unfettered right to administer, interpret, and enforce its Code of Conduct."  Pl. Mot. S.J. 16.

While Elliott-Lewis is correct that incorporating the Code of Conduct conveys an intent to preserve the finality of PCCA decisions, allowing arbitration in the instant matter did not alter the finality of the PCCA's decision.  Mssrs. DiMucci and Queroli each served a one-month suspension from work at the Convention Center in accordance with

-15-

the PCCA's September 14, 2007 letter.[8]  Because Elliott-Lewis, and not the PCCA, is a

signatory to the CBA, the actual decision of the PCCA could not be, and was not,

overturned by an arbitration appeal.  Holding Elliott-Lewis liable for damages arising out

of that decision leaves the decision intact and thus does not conflict with the Code of

Conduct.

Moreover, the arbitration appeal in this case challenged an employment action

undertaken, as a formal matter, by Elliott-Lewis itself.  It is undisputed that PCCA

rendered the original decision to suspend the employees.  Pl. Mot. S.J. ¶ 20.  However,

PCCA's decision "had the effect of requiring Elliott-Lewis to suspend" the employees as

well.  *See* NECA Mot. S.J. 4 (Doc. No. 12, filed February 11, 2008).[9]  In its pleadings,

Elliott-Lewis refers to PCCA's suspension of DiMucci and Queroli as a suspension of

"access to the Convention Center," Pl. Mot. S.J. ¶ 20, but there is no suggestion that

PCCA mandated that Elliott-Lewis suspend DiMucci and Queroli from employment with

Elliott-Lewis entirely.  Although Elliott-Lewis's suspension of two of its employees was a

direct response to PCCA's decision, it was nevertheless formally an employment action

that affected the relationship between two signatories of the CBA, Elliott-Lewis and

---

[8]The letter suspended the employees for one month, from September 17, 2007
through October 17, 2007.  Pl. Mot. S.J. Exh. 3.  The grievance decision was issued on
October 17, 2007, and did not order any reinstatement inconsistent with the PCCA's
decision.  *See* Pl. Mot. S.J. Exh. 1.

[9]David Gentile, Elliott-Lewis's Director of Labor Services, stated that Elliott-
Lewis "suspended [the employees] only because it was instructed to do so by the PCCA."
Affidavit of Jeffrey P. Scarpello ¶ 4.

Local 98.[10]

Elliott-Lewis cites two out-of-circuit appellate cases in support of its claim that the finality of PCCA decisions should foreclose any possible arbitration of those decisions. In *United Steelworkers of America v. Commonwealth Aluminum Corp.*, 162 F.3d 447 (6th Cir. 1998), a union and an employer entered into a collective bargaining agreement that incorporated a health insurance plan.  The plan granted the "Plan Administrator" the right to make "'final and binding'" decisions.  162 F.3d at 449.  Importantly, although the health insurance plan was serviced by a third party, Commonwealth Aluminum (the employer) was itself the plan administrator.  *Id.*  The *Commonwealth Aluminum* court found forceful evidence that the parties, in incorporating the health insurance plan into the collective bargaining agreement, intended to exclude from arbitration an otherwise presumptively arbitrable dispute.  *Id.* at 451-52.  Similarly, in *Local Union No. 4-449, O.C.A.W. v. Amoco Chemical Corp.*, 589 F.2d 162 (5th Cir. 1979), the court denied

---

[10] Elliott-Lewis highlights a potential problem of enforceability that could stem from a holding by this court that PCCA decisions are reviewable via arbitration.  If an arbitrator were to direct a losing party to the arbitration to take action conflicting with a PCCA policy or decision, a court confirming the arbitral award might have difficulty in insuring that its injunctive decree directing the losing party to take the action required by the arbitrator would be enforceable in the face of the expectable resistance of PCCA. *See, e.g., Local 36 AFL-CIO v. FAB Maintenance Corp.*, 2003 U.S. Dist. Lexis 12057 (E.D. Pa. March 21, 2003) (holding that an arbitration decision ordering an employer to reinstate an employee could not be enforced against the landlord of employer's place of business).  This problem, however, does not present itself in the instant matter because the arbitrator's ruling ordered monetary relief only, and PCCA is not a party to this lawsuit.  Furthermore, enforcement problems of this nature do not call into question the arbitrability of the dispute, which is the issue now before this court.

arbitration about disability benefits where a collective bargaining agreement incorporated a "Disability Benefits Plan" that gave the employer's Board of Directors full and final authority "to interpret, apply, amend or revoke this Plan at any time."  589 F.2d at 163.

Neither of these decisions captures the controversy that confronts this court.  In both *Commonwealth Aluminum* and *Amoco*, as plaintiff's brief notes, "the subject of the grievances was based upon a decision made by the company which was party to the collective bargaining agreement containing the arbitration clause procedure, and whose employees were affected by that decision."  Pl. Repl. to Def. Repl. in Support of their Mot. S.J. 6 (Doc. No. 26, filed April 11, 2008).  In contrast, the decision challenged in the case at bar was made not by Elliott-Lewis, the employer, but by the PCCA, an entity not a party to the collective bargaining agreement.  Elliott-Lewis contends that this difference in scenario makes its claim even more compelling than the employer claims sustained in *Commonwealth Aluminum* and *Amoco*.

In both *Commonwealth Aluminum* and *Amoco*, the parties explicitly entrusted the employer/signatory of a collective bargaining agreement with final authority in a specific area, and therefore arbitrating a dispute against the company would have challenged the finality of that company's explicit authority.  In the dispute between Elliott-Lewis and defendants, however, challenging PCCA's decision has no effect on the finality of PCCA's recognized authority because PCCA is not a party to the dispute.  If anything, *Commonwealth Aluminum* and *Amoco* help to elucidate the purposive elements of the

-18-

CSA's drafting.  By investing the PCCA with broad and unchallengeable authority to make decisions about workplace conduct, the CSA empowers the PCCA to act quickly and decisively without fear of repercussion.[11]  By nevertheless permitting the labor supplier and the unions to initiate arbitration appeals of PCCA decisions, the CSA ensures that a party aggrieved by a PCCA decision still has some recourse.[12]

*B.*

Having decided that the dispute here is arbitrable, this court conducts an extremely limited review of the underlying arbitration decision.  The Supreme Court has declared that "the question of interpretation of the collective bargaining agreement is a question for the arbitrator . . . and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his."  *Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 599 (1960).

---

[11] Indeed, Part K of the CSA (entitled "Dispute Resolution Procedures") prefaces its grant of broad authority to PCCA with this clause: "To ensure the resolution of any such dispute with NO DISRUPTION OF WORK."

[12] At first blush it may, as plaintiff argues, seem curious that "the consequences of PCCA's decision" are thereby "foisted upon Elliott-Lewis" and that Elliott-Lewis must defend and potentially be found liable for "a decision that it did not make."  *See* Pl. Mot. S.J. at 16.  Yet a ruling for Elliott-Lewis might well have the more problematic outcome of empowering Elliott-Lewis to circumvent the CBA by reporting any perceived misconduct to PCCA and then waiting for PCCA to act.  *See* Pl. Resp. to Def. Mot. S.J. 13 (Doc. No. 21, filed March 17, 2008).

The Third Circuit has "recognized the narrow scope of review that district courts exercise over labor arbitrators' awards," and it has "'wryly concluded'" that it "''should be clear that the test used to probe the validity of a labor arbitrator's decision is a singularly undemanding one.'' " *National Ass'n of Letter Carriers, AFL-CIO v. U.S.P.S.*, 272 F.3d 182, 185 (3d Cir. 2001) (citations omitted).  We generally leave arbitrators' decisions undisturbed because "the parties have bargained for the arbitrator's decision," and therefore  "'it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept.'" *Tanoma Min. Co., Inc. v. Local Union No. 1269, United Mine Workers of America*, 896 F.2d 745, 747 (3d Cir. 1990) (quoting *United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc.*, 108. S.Ct. 364, 370 (1987)).

Nevertheless, an "award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *Steelworkers of America*, 363 U.S. at 597.  In this Circuit, "[a]n award may fairly be said to 'draw[ ] its essence from the bargaining agreement if the interpretation can in *any rational way* be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention.'" *Major League Umpires Ass'n v. American League of Professional Baseball Clubs*, 357 F.3d 272, 280 (3d Cir. 2004) (citations omitted) (emphasis in original).

The crux of Elliott-Lewis's argument is that "the Award does not draw its essence

from the CSA because the Code of Conduct, as expressly incorporated into the CSA, gives the PCCA the final and unreviewable authority" and therefore "the PCCA's suspension decisions at issue cannot be overturned."  Pl. Repl. to Def. Resp. to Pl. Mot. S.J. 12 (Doc. No. 26, filed April 11, 2008).[13]  The Code of Conduct does at times seem to grant the PCCA entirely unfettered authority.  It states that "[a]ny one determined by the Pennsylvania Convention Center Authority to have violated any of [the Rules of the Code of Conduct] may be ejected and/or prohibited from working on the premises."  Code of Conduct 4.  Elsewhere, however, the Code of Conduct states that the PCCA "applies" to PCCA determinations of violations that take place "after an *appropriate* investigation."  Code of Conduct 1 (emphasis added).

Whether the CSA, and the Code of Conduct it incorporates, grants the PCCA authority so broad that it is empowered to render decisions without cause and without adequate investigation is a question of interpretation on which reasonable parties could easily disagree.  As a result, the arbitrator — not this court — is the proper party to make such an interpretation.[14]  In his affidavit, the NECA arbitrator noted that PCCA did not attend the arbitration meeting and that Elliott-Lewis's representative "conceded that Elliott-Lewis had no evidence linking the two suspended employees to the alleged

---

[13] This argument is essentially a repetition of Elliott-Lewis's claim that the dispute is not arbitrable.

[14] That the court should not rule on the merits of an arbitration dispute is the second of our Circuit's well-established guiding principles in arbitration cases.  *See Lukens*, 989 F.2d at 672-73.

vandalism." There was no evidence presented to the arbitrator to suggest that the decision to suspend the employees was proper or that proper investigation procedures were followed. Therefore, the arbitrator's decision drew its essence from the agreement.

*C.*

Defendant NECA contends that it is "neither a party to the dispute between Elliott-Lewis and Local 98 nor properly before the court" because its role as administrator of the arbitration process entitles it to arbitral immunity. *See* NECA Mot. S.J. 1-2. Because all defendants are entitled to summary judgment on the merits, the court declines to reach this issue.

### IV.

For the above-stated reasons, the court will grant the motions for summary judgment of defendants and deny the motion for summary judgment of the plaintiff. An appropriate order follows.

/s/ Louis H. Pollak
Pollak, J.

-22-

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ELLIOTT-LEWIS CORPORATION,

              Plaintiff

    v.

INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS, LOCAL
98, et al.,

              Defendants

CIVIL ACTION

No. 07-4446

**ORDER**

      **AND NOW**, this 30 day of September, 2008, for the reasons stated in the foregoing memorandum, it is hereby **ORDERED**:

    1.      Plaintiff's motion for summary judgment, *see* Docket No. 14, is **DENIED.**

    2.      Defendants' motions for summary judgment, *see* Docket Nos. 12-13, are **GRANTED.**

                                   /s/ Louis H. Pollak
                                   Pollak, J.